UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

WINSOME THELWELL,

                        **Plaintiff,**                    13 Cv. 1260 (JGK)

          **- against -**                                 MEMORANDUM OPINION AND
                                                          ORDER
CITY OF NEW YORK, ET AL.,

                        **Defendants.**
————————————————————————

**JOHN G. KOELTL, District Judge:**

      The plaintiff, Winsome Thelwell, brought this action
pursuant to § 1981 as amended by the Civil Rights Act of 1991,
42 U.S.C. § 1981; the New York Human Rights Law, New York State
Executive Law § 296 et seq. (the "NYSHRL"); and the New York
City Human Rights Law, Administrative Code of the City of New
York § 8-101 et seq. (the "NYCHRL"), against the defendant, the
City of New York, and an individual defendant, Laura Edidin.
The plaintiff alleges (1) discrimination claims on the basis of
race and national origin arising out of the plaintiff's alleged
non-promotion; (2) hostile work environment claims on the basis
of race and national origin; and (3) retaliation claims on the
basis of the plaintiff's filing of this lawsuit.

      The defendants move pursuant to Rule 56 of the Federal
Rules of Civil Procedure for summary judgment dismissing much of
the Amended Complaint.  The defendants also move for judgment on
the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure dismissing additional allegations of retaliation made in the Amended Complaint after the close of discovery.

## I.

The following facts are taken from the evidence submitted to the Court and are construed in the light most favorable to the plaintiff.  All facts are undisputed unless otherwise noted.

## A.

The plaintiff, Winsome Thelwell, is an African-American woman, born in Jamaica and of West Indian origin.  Am. Compl. ¶ 6.  She has a master's degree in public administration from New York University.  Maduegbuna Decl. Ex. 19.

In 1994, Thelwell began working for the New York City Civilian Complaint Review Board (the "CCRB") as a "College Aide."  Stodola Decl. Ex. L.  The CCRB, a local government agency, receives, investigates, mediates, hears, makes findings, and recommends action on complaints against New York City police officers.  Defs. 56.1 Stmt. ¶ 3.  The CCRB is led by a thirteen-member Board of Directors (the "Board"), and an Executive Director.  Id. ¶ 4.  Thelwell currently works as the manager of one of six teams within the CCRB's investigation unit.  Pl. 56.1 Stmt. ¶ 13; Maduegbuna Decl. Ex. 66.  Each team includes investigators of various levels, a supervisor, an assistant supervisor, and a team manager.  Maduegbuna Decl. Ex. 66.

Thelwell received several promotions in her rise from college aide to her current position of team manager.  In July 1997, Thelwell was promoted to a Level 1 Investigator position, then Level 2 in February 1998, Level 3 in December 1998, and then in June 2001, she became a Supervisory Investigator.  Defs. 56.1 Stmt. ¶¶ 16-19.  Finally, in June 2005, Thelwell was promoted to her current position of team manager.  Id. ¶ 20.  In this role, Thelwell manages Investigative Team 5, oversees Team 5's caseload, and acts as a liaison between Team 5 and CCRB's executive staff, among other things.  Thelwell Dep. at 39-42. As a team manager, Thelwell reports to the Deputy Executive Director for Investigations (the "DEDI"), who in turn reports to the Executive Director of the CCRB.  Thelwell Dep. 88; Maduegbuna Decl. Ex. 14, at 2174.

Until late 2011, Thelwell appears to have received generally good reviews on her performance as manager, with some caveats.  From 2008 to 2011, Thelwell reported to DEDI Meera Joshi.  Thompson Dep. 61-62; Thelwell Dep. 75-76.  In a review for the 2010 year, Joshi gave Thelwell an overall rating of 3.5 on a 1-5 scale, between "Fully Meets Requirements" (3), and "Greatly Exceeds Requirements" (4).  Maduegbuna Decl. Ex. 27. Joshi noted Team 5's "poor team performance" in various metrics for the year, but acknowledged that Thelwell had dealt with "numerous personnel issues and a mounting docket" that year.

Id.  Generally, Joshi gave Thelwell high praise, writing that Thelwell is a "pleasure to work with" and a "strong manager." Id.  In addition to Joshi's 2010 evaluation, Thelwell points to several e-mails and certificates in which her managerial performance or Team 5's performance was recognized.  See Maduegbuna Decl. Exs. 21-22.

Overall, the witness testimony offered in the record paints Thelwell as a competent, albeit strict team manager.  Carlmais Johnson, who worked under Thelwell as a Team 5 investigator and was friendly with Thelwell, Daw Dep. 48, stated that she enjoyed working on Team 5, but that some others did not want to be put on Team 5 because it was a "harder team to be on" due to Thelwell's "high standards" for investigators.  Johnson Dep. 31. Carolene George, the Human Resources Director, also testified that there was a perception of Thelwell as a tough manager, but she did not think it was warranted.  George Dep. 67-68.

**B.**

In September 2010, the defendant Laura Edidin joined CCRB as "special counsel" to run a new project within CCRB, the Administrative Prosecution Unit.  Defs. 56.1 Stmt. ¶ 22.  In September 2011, Joshi left the CCRB, and in November 2011, the Board hired Edidin to replace Joshi as the DEDI.  Id. ¶ 23. Once Edidin became the DEDI, Thelwell reported directly to her. Defs. 56.1 Stmt. ¶ 25; Pl. 56.1 Stmt. ¶ 25.

Thelwell contends that while working under Edidin, she was subjected to a hostile work environment based on her race and national origin.  Thelwell does not point to any explicit comments by Edidin, or any other CCRB employee, that refer to her race or national origin.  Rather, Thelwell contends that in the approximately one year that Edidin was the DEDI, Edidin stereotyped Thelwell as an "angry black woman," and subjected her to harsh and differential treatment as a result.  Thelwell claims that Edidin did so by using words such as "angry," "abrasive," and "unapproachable" to describe Thewell, to Thelwell herself and to others at the CCRB.  Thelwell Dep. 100-02.  Edidin testified that she only described Thelwell as "difficult to work with," not angry, abrasive, or unapproachable.  Edidin Dep. 206.

Edidin and Thelwell plainly had a rocky relationship, and viewed in the light most favorable to the plaintiff, Edidin treated Thelwell more harshly than other team managers.  Johnson testified that when she worked on team four, under a Caucasian supervisor, the team's performance was worse but it received better feedback from Edidin than when she was on team five under Thelwell.  Johnson Dep. 345-46.  Noah Kalkstein, who was also on team five, testified that at one point team five's docket was audited, and a different standard was applied to team five than to other teams. Kalkstein Dep. 50-52.  Thelwell acknowledges

that Edidin never issued any negative written evaluation or
disciplinary charges regarding Thelwell's performance.   Thelwell
Dep. 86.   However, she claims that Edidin criticized her work,
yelled at her, took away some of her managerial duties, and
discussed Thelwell negatively with others, including the then-
Executive Director of the CCRB, Joan Thompson.   Thelwell Dep.
86-88.[1]

Regarding Thelwell's claims that Edidin yelled at her,
Thelwell points to at least two incidents that others described
as "heated" or confrontational.   In March 2012, Thelwell met
one-on-one with Edidin, where Thelwell contends that Edidin
"berated" her and called her "angry and abrasive."   Thelwell
Dep. 110.   George testified that she overheard some of the
meeting, and heard Edidin yell at Thelwell in a disrespectful
manner.   George Dep. 69-70.   Edidin acknowledged that she raised
her voice, but only because Thelwell was interrupting her and
Edidin had to raise her voice to be heard.   Edidin Dep. 199,
202-03.   The second incident occurred in June 2012, at a meeting

---

[1] In her motion papers, the plaintiff relies on statements made by witnesses
in the report written by the New York City Law Department's Equal Employment
Opportunity ("EEO") Officer regarding Thelwell's accusations in this case.
See Maduegbuna Decl. Ex. 26.   However, a party "cannot rely on inadmissible
hearsay in opposing a motion for summary judgment . . . absent a showing that
admissible evidence will be available at trial."   Burlington Coat Factory
Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985)
(internal citations omitted).   Even assuming that the EEO Report falls within
the public records hearsay exception of Rule 803(A)(iii) of the Federal Rules
of Evidence, see Dodson v. CBS Broad. Inc., 423 F. Supp. 2d 331, 334
(S.D.N.Y. 2006), the witness statements within the report that the plaintiff
relies upon, some of which are made anonymously, are plainly hearsay and the
plaintiff may not rely upon them in opposing summary judgment.

of team managers and executive staff, regarding a dispute about whether Thelwell could hire someone to replace an investigator on maternity leave.  Marcos Soler, the Deputy Executive Director for Policy and Strategic Initiative and CCRB's Equal Opportunity Employment Officer, witnessed a "heated confrontation" between Edidin and Thelwell after the other managers had been dismissed, after which Edidin called Thelwell "unreasonable."  Soler Dep. 428-29.

Thelwell claims that Edidin attempted to discipline Thelwell and discussed Thelwell negatively in front of Thompson. Thelwell points to Soler's testimony that in June 2012, Edidin asked Thompson to discipline Thelwell for "insubordination," and that Edidin found Thelwell's "overall demeanor" to be "offensive."  Soler Dep. 422-23.  Soler believed that Edidin's accusation was related to the "transferring of cases," and stated that he and Thompson found that there was no basis for discipline.  Id. at 424.  Thompson, on the other hand, recalled Edidin accusing Thelwell of insubordination after Thelwell had purportedly hung up on Edidin in the middle of a call, but did not believe that Edidin recommended any form of discipline. Thompson Dep. 113.  Edidin also denied that she ever attempted to discipline Thelwell formally, but acknowledged that she accused Thewell of insubordination in front of Thompson for purportedly hanging up on her.  Edidin Dep. 191-92.  Thelwell

denied that she ever hung up on Edidin in the way Edidin
described.  Thelwell Dep. 115-17.

Finally, Thelwell claims that Edidin treated her
differently from comparable employees by imposing several forms
of informal discipline on her, such as assigning "junior staff"
to Team 5, not allowing her to interview one candidate for an
investigative position, and removing someone from her team
without discussing the reasons with her.  Id. at 88, 137.
Thelwell also claims that in June 2012, Edidin accused her of
"padding the docket," or assigning more cases to departing
investigators.  Id. at 118.  Thelwell memorialized that
accusation in an e-mail the following day, and provided facts to
refute the charge.  Maduegbuna Decl. Ex. 41.

Generally, Thelwell contends that Edidin favored a group of
CCRB employees, all Caucasian, with praise and promotions.  See
Pl. 56.1 Stmt. ¶¶ 235-47.  Thelwell points to two instances
where Edidin purportedly promoted two Caucasian investigators
over more qualified, non-White individuals.  Id.  However,
neither of these promotions form the basis of Thelwell's own
failure to promote claims.

### c.

Thelwell alleges that the defendants discriminated against
her by giving two promotions to Dennis McCormick, a Caucasian
male, instead of her.  McCormick joined the CCRB as an

8

investigator in 1996, after receiving his Master's Degree in Criminal Justice.  Stodola Decl. Ex. Q.  He rose various levels from 1996 through 2005, and in September 2005 he became a team manager.  Id. Exs. O, Q.  By at least 2010 and until August 2012, he was the team manager for Team 2.  Stodola Decl. Ex. P; McCormick Dep. 57.

The only written evaluation of McCormick in the record, one by then-DEDI Joshi for 2010, is fairly glowing.  Whereas Joshi gave Thelwell a 3.5 overall rating on the 1-5 scale for the same year, Joshi rated McCormick as 4.5 overall, between "Greatly Exceeds Requirements" (4) and "Exceptional" (5).  Stodola Decl. Ex. P.  Joshi noted that McCormick is a "skilled manager" with a strong statistical performance, that he "works well with and is respected by his colleagues," and that he "volunteered to work on a policy recommendation project," which was successful.  Id. Joshi recommended that McCormick continue to work on policy recommendations and suggested that he would "flourish if given more managerial responsibilities."  Id.  McCormick appears to have interacted with the CCRB Board more than other team managers, including Thelwell.  Several CCRB employees, including those friendly with Thelwell, testified in depositions that McCormick spoke with the Board frequently, whereas Thelwell did not, and that McCormick had a "higher profile" with the Board than Thelwell.  Daw Dep. 103-04; Johnson Dep. 116-17.

**1.**

In March 2012, McCormick was given a new title in addition to his then-position as team manager: Director of Investigative Policy ("DIP").  Defs. 56.1 Stmt. ¶ 33; Pl. 56.1 Stmt. ¶ 33. The defendants at times argue that it was not a true promotion, but the new title came with an 8% pay raise, and an e-mail authorizing the change stated that "McCormick will be promoted" to the new position.  Maduegbuna Decl. Ex. 46.  Thelwell claims that the defendants discriminated against her by offering the position to McCormick instead of her.

The DIP position appears to have been created specifically for McCormick.  The position was not posted, McCormick did not submit an application, and since McCormick has subsequently been promoted, there is no one currently occupying the DIP position. Defs. 56.1 Stmt. ¶ 35; Pl. 56.1 Stmt. ¶ 35; McCormick Dep. 176; Thompson Dep. 173.  Thompson, who authorized the position as the Executive Director, Maduegbuna Decl. Ex. 46, testified that the DIP position was "adjunct" to McCormick's "continuing in his position as manager," and that it was "an office title" he was given for doing extra work for the Board on a large amount of CCRB complaints that came in during the Occupy Wall Street movement ("OWS"), as well as some complaints relating to Stop and Frisk.  Thompson Dep. 168-69, 174-75.  According to

Thompson, no one else was considered for the position besides McCormick.  Id. at 173-74.

Other witnesses confirmed in their deposition testimony that McCormick was doing additional work and reporting to the Board.  Daniel Chu, a Board member, testified that McCormick handled the "unprecedented volume" of complaints that came in during OWS, and "put in countless hours maintaining accurate records and speaking with both Joan Thompson, myself and other members of the board" in working on those matters.  Chu Dep. 140-41.  In at least one public meeting, the Board recognized McCormick for his OWS work.  George Dep. 154-55.

Thelwell claims that all of the investigative teams participated in the disposition of OWS complaints.  Thelwell Dep. 236.  Thompson acknowledged that OWS complaints were sent to every team, but testified that the cases were "funneled back through [McCormick]."  Thompson Dep. 197-98.  Thelwell also contends that the "vast majority" of the complaints were duplicates, Pl. 56.1 Stmt. ¶ 111, and points to a "list of OWS cases" with many labeled as duplicates.  Maduegbuna Decl. Ex. 33.

There is some dispute as to who the final decision-maker was regarding the creation of the DIP position.  Thompson testified that the Board requested the position be created for McCormick, while Chu stated that Thompson made the decision.

Thompson Dep. 169, 173; Chu Dep. 157.  An e-mail sent to CCRB
Human Resources stated that Thompson authorized the promotion.
Maduegbuna Decl. Ex. 46, at D1104.  Whether the Board or
Thompson made the decision, Edidin appeared to have had minimal
to no involvement.  Although, as DEDI, she was McCormick's
direct supervisor at the time in his role as team manager,
McCormick Dep. 180-81, Edidin was not informed about the DIP
position until after the decision was made, when Thompson told
her.  Thompson Dep. 201; Edidin Dep. 197.  McCormick had
previously discussed his interest in policy with Edidin, but
they never discussed the DIP position.  McCormick Dep. 177-78.
McCormick reported to Soler in McCormick's role in the DIP
position, and continued to report to Edidin in his role as team
manager.  Id. at 180-81.

### 2.

In August 2012, Edidin left her position as DEDI to become
the Deputy Executive Director of the Administrative Prosecution
Unit.  Defs 56.1 Stmt. ¶ 43.  The CCRB Board hired McCormick to
replace her as DEDI.  Stodola Decl. Ex. Y.  Thelwell claims that
the defendants discriminated against her based on her race and
national origin by promoting McCormick to the DEDI position
instead of her.

In May 2012, the CCRB posted an initial job vacancy notice
for the DEDI position, which required candidates to have a law

degree.  Defs. 56.1 Stmt. ¶¶ 44-45.  In July 2012, the CCRB
posted a revised vacancy notice with the law degree requirement
removed.  Id. ¶ 47.  There is some dispute over why the
requirement was removed.  Chu testified that Thompson was "less
than fully impressed with the pool of applicants," and wanted to
expand the pool by removing the requirement.  Chu Dep. 124-25.
Thompson, on the other hand, testified that the Board requested
the change because they wanted McCormick in the position, and
McCormick does not have a law degree and the Board had been
working with McCormick "in a very satisfactory manner."
Thompson Dep. 187-88.  In any event, once the law degree
requirement was removed, all of the team managers, including
Thelwell, were informed of the change and invited to apply for
the position.  Defs. 56.1 Stmt. ¶ 48; Pl. 56.1 Stmt. ¶ 48.

    Thelwell did not apply for the position.  Defs. 56.1 Stmt.
¶ 49; Pl. 56.1 Stmt. ¶ 49.  She claims that she did not apply
because she spoke with Soler and he informed her that the Board
and executive staff had already "narrowed the field to 'four'
good candidates."  Stodola Decl. Ex. W.  Thelwell relayed that
information in an e-mail chain with another CCRB employee who
applied for the position.  Id.  However, two days before
Thelwell apparently spoke with Soler, Thelwell was asked in the
same e-mail chain whether she would be applying for the

position, and she responded that "Denise [another CCRB employee] already has the DED job."  Id.

In a letter dated July 12, 2012, McCormick applied for the DEDI position, and his application was forwarded to Thompson, who then forwarded his application along with four others to Daniel Chu.  Maduegbuna Decl. Ex. 52.  After the Board interviewed McCormick, McCormick Dep. 225-26, the Board unanimously selected McCormick for the position.  Chu Dep. 147. According to Chu, Soler, and Thompson, who were all involved in the selection process, McCormick was selected because of his strong performance as team manager and his additional work with the Board.  Soler Dep. 249-53; Chu Dep. 148; Thompson Dep. 209-10.  Roger Smith, a candidate who was not selected, was given control of training within the CCRB instead.  Thompson Dep. 211-12.  This position included a salary increase, a new title, "Director of Training," and it was not posted.  Id.

Edidin disagreed with the removal of the law degree requirement, and she testified in her deposition that she informed Chu that she did not think McCormick should hold the DEDI position because he is not a lawyer.  Edidin Dep. 306-07; Thompson Dep. 214-15.  On August 7, 2012, after the Board selected McCormick, Thompson announced to the CCRB staff by e-mail that McCormick was promoted to DEDI.  Stodola Decl. Ex. Y.

**D.**

After Thelwell learned of McCormick's first raise in
connection with the DIP position, she met with Edidin in March
2012 to argue that Thelwell's team, Team 5, performed as well or
better than McCormick's, and that Thelwell also deserved a
raise.  Defs. 56.1 Stmt. ¶ 56; Pl. 56.1 Stmt. ¶ 56.  Thereafter,
Edidin e-mailed Soler requesting statistics comparing Team 5's
performance against the other teams.  Defs. 56.1 Stmt. ¶ 57.
Soler responded with an analysis of Team 5's statistical
performance, primarily for 2011.  Stodola Decl. Ex. S.  Soler
indicated that Thelwell had some good statistics for 2011,
including a "substantial number of full investigations," and a
"very low truncation rate," which refers to the number of
complaints terminated at an early stage without a full
investigation.  Id.  However, Soler noted that Thelwell
"continues to struggle" with time management.  Id.  Soler also
attributed Thelwell's positive 2011 statistics, in part, to her
team's receipt of "fewer cases than any other team," and its
increased referral rate.  Id.  Soler pointed out that Thelwell
had similar problems in the past.  Id.

In April 2012, Thelwell sent a letter to Thompson detailing
her complaint that Thelwell's work was "going unrecognized."
Stodola Decl. Ex. T.  Thelwell wrote that she had met with
Edidin, and that Edidin had unfairly attributed Thelwell's 2011

15

successes to the investigators working underneath Thelwell, whom Thelwell alleged were Edidin's personal friends.  Id.  In early June 2012, Thelwell again met with Edidin, when Edidin purportedly accused Thelwell of "padding the dockets of investigators" that were leaving Team 5.  Maduegbuna Decl. Ex. 41.  Thelwell again wrote to Thompson after this meeting, stating that she informed Edidin that she would no longer meet with Edidin alone because Edidin is "not careful with facts, and does not verify information that casts me in a negative light before she disseminates it."  Maduegbuna Decl. Ex. 40.

On July 23, 2012, Thelwell filed an internal complaint alleging a hostile work environment on the basis of color, race, and national origin.  Stodola Decl. Ex. X.  Thelwell alleged that a "caricature" was being painted of her as "the angry black woman," and described various grievances.  Id.  The complaint was referred to an EEO Officer at the New York City Law Department, who found no probable cause to support Thelwell's hostile work environment claims.  Maduegbuna Decl. Ex. 26.

**E.**

Thelwell brought this action in February 2013.  The initial Complaint alleged six causes of action, including three counts alleging discrimination pursuant to 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL, and three counts alleging retaliation pursuant to each statute.  In support of the discrimination

16

claims, the Complaint alleged that Thelwell was treated differently from similarly situated white employees, Compl. ¶ 54, and was not promoted on two occasions because of her race, color, and national origin.  Compl. ¶¶ 36-50.  As to the retaliation claims, the Complaint primarily alleged that the defendants failed to promote Thewell in response to her complaints of discrimination.  Compl. ¶ 53.

After several extensions of time to complete discovery, the parties completed discovery in December 2014.  In late December 2014, the plaintiff filed an Amended Complaint.  The Amended Complaint retains the same six causes of action, but adds several paragraphs concerning alleged retaliatory actions that occurred in the time since the plaintiff filed this lawsuit.  The plaintiff alleges that in June 2013, Tracy Catapano-Fox became the new Executive Director of the CCRB, and took several adverse actions against the plaintiff in retaliation for her bringing this lawsuit.

The plaintiff alleges that Catapano-Fox formally disciplined Thelwell in retaliation for filling this lawsuit.  According to the Amended Complaint, on August 23, 2013, Catapano-Fox issued Thelwell a "Supervisory Conference Memorandum," a form of discipline that is permanently placed in an employee's personnel file.  Am. Compl. ¶¶ 61-62.  The Memorandum recounts a conversation that took place between

Catapano-Fox, McCormick, and Thelwell about Thelwell's failure
to follow a new policy that Catapano-Fox and McCormick issued
two days earlier (the "New Policy").  Maduegbuna Decl. Ex. 58.
According to the Memorandum, the New Policy directed employees
to "err on the side of keeping all documents," rather than
shredding them, and Thelwell failed to follow that policy.  Id.
According to the plaintiff, however, the New Policy was "never
clearly articulated" and "there was agency-wide confusion."  Am.
Compl. ¶ 64.  Indeed, in January 2014, McCormick sent a memo to
the CCRB Investigative Staff following up on and clarifying
Catapano-Fox's instructions regarding the retention of
documents.  Maduegbuna Decl. Ex. 59.  The plaintiff alleges that
Catapano-Fox used the unclear New Policy as a pretext to
retaliate against the plaintiff for filing this suit.

    The plaintiff also alleges that Catapano-Fox took several
other actions in retaliation for the plaintiff's filing of this
action.  The plaintiff alleges that as soon as Catapano-Fox
became the Executive Director, Catapano-Fox told CCRB employees
to stay away from the plaintiff, Am. Compl. ¶ 58; that
Catapano-Fox and McCormick have refused to provide a formal
evaluation of the plaintiff's 2013 performance and have delayed
the plaintiff's timesheets, id. ¶¶ 67-71; and that Catapano-Fox
unjustifiably blamed the plaintiff for leaking a memorandum and

referred the plaintiff to the City's Department of
Investigation.  Id. ¶¶ 71-74.

On February 13, 2015, the defendants filed the present
motion.

## II.

The defendants move for summary judgment pursuant to Rule
56 of the Federal Rules of Civil Procedure dismissing the
plaintiff's discrimination claims based on a hostile work
environment and the claims relating to the two failures to
promote.  The defendants move for judgment on the pleadings
pursuant to Rule 12(c) dismissing the retaliation claims that
were added in the Amended Complaint after the close of
discovery.

The standard for granting summary judgment is well
established.  "The Court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs.,
LP, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's
task at the summary judgment motion stage of the litigation is
carefully limited to discerning whether there are any genuine
issues of material fact to be tried, not to deciding them.  Its
duty, in short, is confined at this point to issue-finding; it

does not extend to issue-resolution." Gallo, 22 F.3d at 1224.
The moving party bears the initial burden of "informing the
district court of the basis for its motion" and identifying the
matter that "it believes demonstrate[s] the absence of a genuine
issue of material fact." Celotex, 477 U.S. at 323.  The
substantive law governing the case will identify those facts
which are material and "[o]nly disputes over facts that might
affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)
(citing United States v. Diebold, Inc., 369 U.S. 654, 655
(1962)).  Summary judgment is improper if there is any evidence
in the record from any source from which a reasonable inference
could be drawn in favor of the non-moving party.  See Chambers
v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the
moving party meets its burden, the non-moving party must produce
evidence in the record and "may not rely simply on conclusory
statements or on contentions that the affidavits supporting the
motion are not credible . . . ." Ying Jing Gan v. City of New

York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v.
Almenas, 143 F.3d 105, 114–15 (2d Cir. 1998) (collecting cases).

The standards to be applied to a motion for judgment on the
pleadings pursuant to Federal Rule of Civil Procedure 12(c) are
the same as those applied to a motion to dismiss pursuant to
Federal Rule of Civil Procedure 12(b)(6).  Cleveland v. Caplaw
Enters., 448 F.3d 518, 521 (2d Cir. 2006).  "Thus, [a court]
will accept all factual allegations in the complaint as true and
draw all reasonable inferences in [the] plaintiff[']s[ ] favor.
To survive a Rule 12(c) motion, [the] complaint must contain
sufficient factual matter, accepted as true, to state a claim to
relief that is plausible on its face."  Hayden v. Paterson, 594
F.3d 150, 160 (2d Cir. 2010).  In deciding such a motion, the
court may consider documents that are referenced in the
complaint, documents that the plaintiff relied on in bringing
suit and that either are in the plaintiff's possession or were
known to the plaintiff when she brought suit, or matters of
which judicial notice may be taken. See Chambers v.. Time
Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Brass v. Am.
Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993); see also
Morillo v. Grand Hyatt New York, No. 13cv7123, 2014 WL 3498663,
at *6 (S.D.N.Y. July 10, 2014).

### III.

While the Amended Complaint alleges that the plaintiff was subjected to discrimination based on her race, color, and national origin, other than the two alleged failures to promote, the plaintiff does not allege that she suffered any adverse employment actions.  Rather, her complaint under § 1981, the NYSHRL, and the NYCHRL is that Edidin treated the plaintiff more harshly than similarly situated white employees and stereotyped the plaintiff based on her race and national origin.  The papers in connection with the current motion describe this as a claim for hostile work environment.  At oral argument of the current motion, the plaintiff agreed that the discrimination claims are based on the two alleged failures to promote and a claimed hostile work environment.

### A.

Hostile work environment claims under § 1981 and the NYSHRL are analyzed using the same standard applied to Title VII hostile work environment claims.  See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 723-24 (2d Cir. 2010) (section 1981); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006) (NYSHRL).  To establish a prima facie case of a hostile work environment, a plaintiff must show: (1) discriminatory harassment that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and

create an abusive working environment," and (2) a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). The plaintiff must show not only that the plaintiff subjectively perceived the environment to be abusive but also that the environment was objectively hostile and abusive. See Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004).

The first element of the prima facie case must be established by a showing that "the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [the plaintiff's] employment were thereby altered." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). "Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.'" Demoret, 451 F.3d at 149 (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 227 (2d Cir. 2004)). Generally, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Id. (quoting Alfano, 294 F.3d at 374). "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected

characteristic." Tolbert v. Smith, No. 14-1012-CV, 2015 WL
3875237, at *8 (2d Cir. June 24, 2015).

In analyzing a hostile work environment claim, courts
assess the totality of the circumstances, "considering a variety
of factors including 'the frequency of the discriminatory
conduct; its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work performance.'"
Demoret, 451 F.3d at 149 (quoting Harris, 510 U.S. at 23); see
also Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 973 F.
Supp. 2d 386, 405-06 (S.D.N.Y. 2013), aff'd, 586 F. App'x 739
(2d Cir. 2014).

The plaintiff contends that Edidin stereotyped the
plaintiff as an "angry black woman," and incessantly denigrated
and criticized the plaintiff, thus creating a hostile work
environment for the plaintiff.  The plaintiff concedes that
Edidin did not use any explicit racial terms, but the plaintiff
objects that Edidin used words such as "angry" and "abrasive" to
portray the plaintiff as the stereotypical "angry black woman."
See Heard v. Bd. of Trustees, No. 11cv13051, 2013 WL 142115, at
*12 (E.D. Mich. Jan. 11, 2013) (defining the "angry black woman"
stereotype as, among other things, "a shrill nagger with
irrational states of anger and indignation").

Section 1981 recognizes "dog-whistle racism," or "the use of code words and themes which activate conscious or subconscious racist concepts and frames." Lloyd v. Holder, No. 11cv3154, 2013 WL 6667531, at *9 (S.D.N.Y. Dec. 17, 2013). "[F]acially non-discriminatory terms" may "invoke racist concepts that are already planted in the public consciousness," such as "welfare queen," "terrorist," "thug," and "illegal alien." Id.  In determining whether race-neutral words are used as racially charged code words, "various factors" are important, such as "context, inflection, tone of voice, local custom, and historical usage." Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam) (holding that use of "boy," without any racial modification, may be evidence of discrimination).

In this case, the few instances of Edidin's purported use of the words "angry" and "abrasive" do not rise to the level of racial code words such as "boy" or "thug."  There is no evidence from context that the terms "angry" or "aggressive" were racially charged in any way, and there is no evidence that in her entire employment at CCRB anyone used a racial epithet to describe the plaintiff.  Allegations that a plaintiff was stereotyped as an "angry black woman" "could support a claim for racial and/or gender discrimination," but in this case the plaintiff's "subjective interpretation" of Edidin's use of "critical but facially non-discriminatory terms does not,

25

itself, reveal discriminatory animus." <u>Humphries v. City Univ.</u>
<u>of New York</u>, No. 13cv2641, 2013 WL 6196561, at *9 (S.D.N.Y. Nov.
26, 2013) (dismissing, in a case involving discriminatory
termination, the plaintiff's claim that she was stereotyped as
an "angry black woman").

Moreover, all of the conduct alleged by the plaintiff does
not rise to the level of a hostile work environment.   The
plaintiff only points to several instances when Edidin raised
her voice or criticized the plaintiff during the year, but those
actions are not "so severe as to be abusive" enough to
constitute a hostile work environment.   <u>Demoret</u>, 451 F.3d at
150; <u>see also</u> <u>Lucenti v. Potter</u>, 432 F. Supp. 2d 347, 362
(S.D.N.Y. 2006) ("Allegations of even constant reprimands and
work criticism by themselves are not sufficient to establish a
hostile environment claim.").  Even if Edidin's few uses of
words like "angry" to refer to the plaintiff were imbued with
the racial subtext the plaintiff gives them, the plaintiff has
not shown that the comments constituted "more than a few
isolated incidents of racial enmity." <u>Williams v. Cnty. of</u>
<u>Westchester</u>, 171 F.3d 98, 100-01 (2d Cir. 1999) (per curiam)
(quoting <u>Snell v. Suffolk County</u>, 782 F.2d 1094, 1103 (2d Cir.
1986)).  Such comments fall far short of the "steady barrage of
opprobrious racial comments" required for a hostile work
environment claim based on race.   <u>Id.</u> at 101 (quoting <u>Schwapp v.</u>

26

Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)).  Indeed, the plaintiff testified at her deposition that she was able to perform her duties effectively throughout the period of the alleged hostile work environment.  Thelwell Dep. 92-96.  Thus, a jury could not find that Edidin's actions "unreasonably interfer[ed] with [the plaintiff's] work performance."  Demoret, 451 F.3d at 149.

Accordingly, the plaintiff's hostile work environment claims under § 1981 and the NYSHRL are **dismissed.**

### B.

The NYCHRL is intended to be more protective than state and federal law.  Farrugia v. N. Shore Univ. Hosp., 820 N.Y.S.2d 718, 724 (Sup. Ct. 2006).  The "severity" and "pervasiveness" of the alleged harassment "are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability."  Williams v. New York City Hous. Auth., 872 N.Y.S.2d 27, 38 (App. Div. 2009) (citing Farrugia, 820 N.Y.S.2d at 725).  "Thus, less egregious conduct than that required under Title VII may support a hostile work environment claim under the NYCHRL."  Panzarino v. Deloitte & Touche LLP, No. 05cv8502, 2009 WL 3539685, at *9 (S.D.N.Y. Oct. 29, 2009); see also Fincher, 604 F.3d at 724 n.10.

However, the "broader purposes of the NYCHRL do not connote an intention that the law operate as a general civility code."

Zhao v. Time, No. 08cv8872, 2010 WL 3377498, at *23 (S.D.N.Y. Aug. 24, 2010).  Summary judgment is available where the employer can prove that the alleged conduct does not even represent a "borderline" violation, but "could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences." Williams, 872 N.Y.S.2d at 41; see also Sims v. City of New York, No. 08cv5965, 2010 WL 3825720, at *12 (S.D.N.Y. Sept. 30, 2010).  In this case, even under the NYCHRL's more liberal standard, the conduct alleged, such as Edidin's criticism of the plaintiff, remains far from even a borderline hostile work environment violation.  See Dressler v. New York City Dep't of Educ., No. 10cv3769, 2012 WL 1038600, at *10 (S.D.N.Y. Mar. 29, 2012) (finding "harsh criticism" and "increased scrutiny" insufficient to demonstrate a hostile work environment under the NYCHRL). Accordingly, the plaintiff's hostile work environment claim under the NYCHRL is **dismissed.**

## IV.

The plaintiff claims that the defendants discriminated against her by failing to promote her to the DIP position in March 2012, and to the DEDI position in August 2012.

Failure-to-promote discrimination claims under § 1981 and the NYSHRL are evaluated under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411

U.S. 792, 802–03 (1973).  See Brown v. City of Syracuse, 673
F.3d 141, 150 (2d Cir. 2012).  Initially, the plaintiff has the
burden of proving by a preponderance of evidence a prima facie
case of discrimination.  McDonnell Douglas, 411 U.S. at 802.
"To establish a prima facie case of a discriminatory failure to
promote, a [Section 1981] plaintiff must ordinarily demonstrate
that: (1) she is a member of a protected class; (2) she applied
and was qualified for a job for which the employer was seeking
applicants; (3) she was rejected for the position; and (4) the
position remained open and the employer continued to seek
applicants having the plaintiff's qualifications."  Aulicino v.
New York City Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir.
2009) (quoting Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d
Cir. 2004)).  In sum, the plaintiff must show that she "was
rejected under circumstances which give rise to an inference of
unlawful discrimination."  Id.  The plaintiff's prima facie
burden is "not onerous."  Howley v. Town of Stratford, 217 F.3d
141, 150 (2d Cir. 2000) (quoting Texas Department of Community
Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

If the plaintiff demonstrates a prima facie case, the
burden of production shifts to the employer to articulate a
legitimate, clear, specific and non-discriminatory reason for
refusing to promote the employee.  See Holt v. KMI-Cont'l, Inc.,
95 F.3d 123, 129 (2d Cir. 1996).  The defendants' burden at this

stage is "one of production, not persuasion; it can involve no credibility assessment." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). Finally, if the defendants satisfy this burden of production, the plaintiff has the ultimate burden to prove that the employer's reason was merely a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515-16 (1993) (quoting Burdine, 450 U.S. at 258); see also Holt, 95 F.3d at 129. "The plaintiff must produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendants] were false, and that more likely than not [discriminatory animus] was the real reason for the [failure to promote].'" Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)).

It is "unclear whether, and to what extent the McDonnell Douglas burden-shifting analysis has been modified for NYCHRL claims." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 110 n.8 (2d Cir. 2013). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims," though "summary judgment still can be an appropriate mechanism for resolving NYCHRL claims." Id. at 109, 111. The same factors considered under the McDonnell Douglas framework may be taken into account, such as non-discriminatory

explanations, but summary judgment is appropriate for the defendants only if "discrimination played no role in [their] actions." Id. at 110 n.8 (quoting Williams, 872 N.Y.S.2d at 38, 40 n.27).

## A.

The plaintiff's first claim for failure to promote is for the DIP Position to which McCormick was promoted in March 2012. The plaintiff, an African American of West Indian origin, is a member of a protected class, and thus has satisfied the first requirement of her prima facie case. The other requirements are more complicated.

In the usual case, a failure to promote claim requires that the plaintiff "applied for a specific position or positions and was rejected therefrom," in order to ensure that the plaintiff "alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." Brown v. Coach Stores, Inc., 163 F.3d 706, 710 (2d Cir. 1998). The defendants argue that the plaintiff never applied for the DIP position, and therefore cannot make out a prima facie case of discrimination. But the position was never posted. "[T]o be excused from the specific application requirement, an employee must demonstrate that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal

31

procedures endorsed by the employer." Petrosino, 385 F.3d at 227.  The plaintiff is excused from the application requirement because the DIP position was never posted, and the plaintiff had no knowledge of it.  See, e.g., Roberti v. Schroder Inv. Mgmt. N. Am., Inc., No. 04cv2404, 2006 WL 647718, at *6 (S.D.N.Y. Mar. 14, 2006) (denying motion to dismiss for failure to apply where the plaintiff had no knowledge of unposted position).

The ad hoc nature of the DIP position also makes the necessary qualifications unclear.  However, the burden on a plaintiff to show qualifications at the prima facie stage is quite low, and she need only show that she "possesses the basic skills necessary for performance of the job." De la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 20 (2d Cir. 1996) (alteration omitted).  The plaintiff's Master's degree in public policy and her past commendations and positive review are sufficient to meet the qualifications requirement. See id. at 21 ("[A] performance evaluation that is positive overall is sufficient to withstand summary judgment at the prima facie stage of analysis.").

The circumstances of this case do not give rise to an especially compelling inference of discrimination.  The plaintiff provided some evidence showing that Edidin treated her more harshly than similarly situated team managers, that Edidin favored Caucasian employees, and that the defendants elevated

32

McCormick, a white male, over the plaintiff to a position for which she was otherwise qualified.  See, e.g., Leibowitz v. Cornell Univ., 584 F.3d 487, 502 (2d Cir. 2009) (holding that inference of discrimination may arise from "more favorable treatment of employees not in the protected group").  However, Edidin, the only alleged discriminatory actor, appeared to have minimal involvement, if any, in the creation of the DIP position.  Accordingly, the plaintiff has satisfied her minimal prima facie burden, if only barely.

But in any event, the defendants have offered a legitimate non-discriminatory reason for promoting McCormick to the DIP position, and the plaintiff has not demonstrated that the proffered reason was a pretext for a discriminatory motive on the basis of race or national origin.  The defendants contend that McCormick was given the title of Director of Investigative Policy because he volunteered to assist the Board with the high volume of CCRB complaints that came in during OWS.

The plaintiff has not disputed all of the deposition testimony that McCormick had a "higher profile" with the Board than other team managers, Daw Dep. 103-04; Johnson Dep. 116-17; and that he was recognized for taking on additional work relating to OWS.  Thompson Dep. 169, 174-75; Chu Dep. 140-41; George Dep. 154-55.  Indeed, the evaluation covering McCormick's 2010 performance noted that he had volunteered on a policy

project, and strongly recommended that he be given more responsibilities.  Stodola Decl. Ex. P.  Meera Joshi, the previous DEDI, wrote the evaluation, and the plaintiff does not allege that Joshi had any discriminatory animus.  McCormick plainly continued to pursue extra work relating to policy matters, and he received a new policy title in addition to his role as team manager.

The plaintiff argues that the procedural irregularity of the position's creation demonstrates it was pretextual: the CCRB usually posts positions, and this one was not posted.  However, as an initial matter, the plaintiff has not shown that CCRB was required to post the position, and thus there was no procedural irregularity that would demonstrate pretext.  Thompson testified in her deposition that there was no obligation to post the position because it was simply an additional title given to McCormick for "doing special work," and not a full-time position.  Thompson Dep. 168-69, 171.  And on at least one other occasion, the defendants created a position specifically for Rogert Smith, a racial minority, without posting the position for others.  Id. at 211-12; Smith Dep. 245-46.  The plaintiff has not offered any evidence to show that there was an obligation to post the DIP position.  The plaintiff points to a 1998 "Personnel Services Bulletin" from the Department of Citywide Administrative Services ("DCAS") regarding the

requirement for agencies to post vacant positions.  Maduegbuna Decl. Ex. 44.  But the plaintiff offers no testimony or other record evidence indicating that this bulletin applies to the DIP position.  Therefore, the plaintiff has not shown that the CCRB deviated from its own procedures in any way.

Moreover, "as a general matter, the mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent."  Harris v. Niagara Mohawk Power Corp., 252 F.3d 592, 599 (2d Cir. 2001) (alteration omitted).  It is true that "departures from procedural regularity . . . *can* raise a question as to the good faith of the process," but only "where the departure may reasonably affect the decision."  Weinstock, 224 F.3d at 45.  As in Weinstock, any procedural irregularity here only "serve[s] to support [the defendants'] proffered nondiscriminatory reason."  Id.  The position was not posted because it was created *for* McCormick, not just any CCRB employee, due to McCormick's apparent interest and volunteer work.  It provided additional compensation and responsibilities for McCormick while he also continued to perform his prior job responsibilities.  Accordingly, whatever procedural irregularity may have existed in this case, it does not demonstrate that the defendants' proffered reason is a pretext for discrimination.

The plaintiff also argues that the reason is pretextual because a significant portion of the OWS complaints were duplicates, Maduegbuna Decl. Ex. 33, and that other investigative teams worked on OWS complaints as well.[2]  While Thompson acknowledged that other teams worked on OWS complaints, she also testified that McCormick had a more prominent role in handling them and they were all "funneled back" through him. Thompson Dep. 197-98.  Neither of the plaintiff's proffered facts contradicts or undermines the evidence that McCormick had a closer working relationship with the Board than other team managers, and that he had been recognized for his work on the OWS complaints.  Therefore, there is nothing about those facts that would permit a rational jury to conclude that the defendants' claim that McCormick was promoted for his extra work "was false, *and* that discrimination was the real reason" for McCormick's promotion.  Hicks, 509 U.S. at 515 (emphasis in original).

Finally, the plaintiff argues that McCormick's work with the Board could not have led to his promotion because, according to the plaintiff, the Board did not actually authorize McCormick's promotion.  There are some discrepancies between the testimony of Chu and Thompson as to who actually created the

---

[2] The plaintiff actually makes this argument in her papers in response to the defendants' proffered nondiscriminatory reason for promoting McCormick to the DEDI position, rather than the DIP position.  Because the argument is also applicable to the DIP position, the Court will consider it in this context.

36

position, Thompson Dep. 173; Chu Dep. 157; and it appears that
Thompson provided the final authorization for the promotion.
Maduegbuna Decl. Ex. 46, at D1104.  But these discrepancies do
not make a difference in this case.  The plaintiff does not
allege that either the Board or Thompson acted with
discriminatory animus.  And there is no evidence that Edidin,
the only person to whom the plaintiff ascribes a racial animus,
was a decision-maker or caused the decision to give McCormick
the DIP responsibilities.  Therefore, regardless of whether a
jury concluded that the Board or Thompson initiated and
authorized McCormick's promotion, there is no basis for a
rational jury to conclude that the decision was motivated by
discriminatory animus.

The plaintiff has failed to demonstrate that a rational
jury could conclude that discrimination based on the plaintiff's
race or national origin played a role in the defendants'
decision to create the DIP position for McCormick, and not the
plaintiff.  Accordingly, the plaintiff's failure to promote
claims based on the DIP position are **dismissed.**

**B.**

The plaintiff's second failure to promote claim is based on
McCormick's promotion to DEDI in August 2012.  The plaintiff has
not made out a prima facie case for this claim because there is

no reason to excuse the plaintiff's failure to apply for the DEDI position.

The plaintiff concedes that the DEDI position was posted and that she was aware of it, and thus the exception in Petrosino plainly does not excuse the plaintiff's failure to apply.  385 F.3d at 227.  Instead, the plaintiff argues that it would have been futile for her to apply because of Edidin's discriminatory conduct, and because a member of the executive staff informed her that they had narrowed the field to "four good candidates."  Pl. 56.1 Stmt. ¶ 189.  "[A] plaintiff's failure to apply for a position is not a bar to relief when an employer's discriminatory practices deter application or make application a futile endeavor."  Malarkey v. Texaco, Inc., 983 F.2d 1204, 1213 (2d Cir. 1993).  A nonapplicant plaintiff claiming futility bears the "not always easy burden of proving that [s]he would have applied for the job had it not been for those [discriminatory] practices."  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 367-68 (1977); see also Brown v. Coach Stores, 163 F.3d at 711.

In this case, the plaintiff has not demonstrated how any of the defendants' alleged discriminatory practices deterred the plaintiff from applying for the DEDI position.  The plaintiff relies principally on Malarkey, but in that case, there was no open posting of the positions, and the jury could have found

that the alleged discriminatory actor played a "key role" in recommending candidates to the informal openings, making the plaintiff's applications futile.  983 F.2d at 1213.  By contrast, the plaintiff here was explicitly invited to apply, and Edidin, the only alleged discriminatory actor, had just a minor role in the application process.  Indeed, the plaintiff points to information she heard about the field of candidates from Soler, not Edidin, in explaining why she was discouraged from applying.  The plaintiff does not allege that Soler had any discriminatory animus towards the plaintiff.  Moreover, prior to when the plaintiff had spoken to Soler, she indicated that she would not apply because another employee, who did not ultimately receive the promotion, "already has the DED job."  Stodola Decl. Ex. W.  The plaintiff has not shown that she "would have applied for" the DEDI position "had it not been for" any discriminatory practices by the defendants.  Teamsters, 431 U.S. at 367-68. Accordingly, the plaintiff has failed to demonstrate a prima facie claim of discrimination based on her claim for a failure to promote to the DEDI position.

In any event, the defendants offered a legitimate, nondiscriminatory reason for McCormick's promotion, and the plaintiff has not demonstrated that it was pretextual.  The Board promoted McCormick to DEDI by unanimous decision based on his record as team manager and his policy work.  The plaintiff

has not alleged that the Board acted with any discriminatory animus in doing so.  Rather, the plaintiff argues that Edidin's involvement in the selection process, which the record suggests was minimal, tainted the selection process with discriminatory animus.

"[I]mpermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision . . . even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process." Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999).  The plaintiff has not shown that Edidin had a "meaningful role" in McCormick's promotion over the non-parties who, unlike the plaintiff, had actually applied for the DEDI position.  Id. at 451 (affirming dismissal of Title VII claim due to "absence of evidence establishing any causal link between [purported recommender's] alleged discriminatory bias and [defendant's] decision to deny [the plaintiff's] promotion").  The plaintiff concedes that Edidin opposed the removal of the law degree requirement and recommended against McCormick's promotion to DEDI.  Therefore, even assuming the plaintiff has shown that Edidin was impermissibly biased against the plaintiff, that bias did not taint the Board's decision to promote McCormick because the Board, "the ultimate decision

40

maker, did not rely on [Edidin's] opinion." Waheed v. SUNY
Brooklyn Educ. Opportunity Ctr., No. 04cv5630, 2007 WL 2126092,
at *7 (E.D.N.Y. July 24, 2007).  Accordingly, no rational jury
could find that the defendants' reasons for promoting McCormick
to DEDI were pretexts for discrimination against Thelwell, or
that race played any role at all in the Board's decision to
promote McCormick.

Because both of the plaintiff's failure to promote claims
fail, her claims for discrimination under § 1981, the NYSHRL,
and the NYCHRL are **dismissed.**

**V.**

The plaintiff brings claims for retaliation pursuant to
Section 1981, the NYSHRL, and the NYCHRL.  She alleges that the
City, through CCRB's Executive Director Catapano-Fox, retaliated
against her for filing this lawsuit by taking several adverse
employment actions against her, including issuing a disciplinary
memo.[3]  Because the plaintiff added these allegations after the

---

[3] In the original Complaint, the plaintiff's allegations of retaliation
centered on Edidin's purported "differential treatment" of the plaintiff in
retaliation for the plaintiff's filing of an internal discrimination
complaint.  Compl. ¶¶ 53-54.  The plaintiff has since abandoned any
retaliation claims against Edidin, and is now only pursuing her claims
against the City based on the actions of Catapano-Fox.  Accordingly, because
the plaintiff's other discrimination claims against Edidin are being
dismissed, the plaintiff no longer has any claims against Edidin, and the
Complaint against Edidin is **dismissed.**

41

close of discovery, the defendants move to dismiss the claims
pursuant to Rule 12, rather than seeking summary judgment.[4]

Federal and state law retaliation claims are also reviewed
under the McDonnell Douglas burden-shifting approach.  Kwan v.
Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013).  The
plaintiff must establish a prima facie case of retaliation by
showing 1) "participation in a protected activity"; 2) the
defendant's knowledge of the protected activity; 3) "an adverse
employment action"; and 4) "a causal connection between the
protected activity and the adverse employment action."  Id. at
844.  Although a plaintiff is not required to allege facts
establishing a prima facie case of discrimination to survive a
motion to dismiss, Swierkiewicz v. Sorema N.A., 534 U.S. 506,
508 (2002), a plaintiff must plead "sufficient factual matter,
accepted as true, to state a claim to relief that is plausible
on its face."  Iqbal, 556 U.S. at 678; see also Rullan v. New
York City Sanitation Dep't, No. 13cv5154, 2014 WL 2011771, at *6
(S.D.N.Y. May 16, 2014), aff'd, No. 14-2127, 2015 WL 3771755 (2d
Cir. June 18, 2015).  The defendants concede that the
plaintiff's lawsuit is a protected activity and that
Catapano-Fox was aware of the lawsuit, but argue that the
plaintiff has not shown that any adverse employment actions were

---

[4] In the event the Court denies their motion, the defendants request additional
time for discovery on the new allegations.  Because the Court is denying the
defendants' motion to dismiss, the Court grants that request.

taken against her, and that there is no causal connection between her filing of the lawsuit and any alleged adverse actions.

### A.

To plead that an adverse employment action occurred, the plaintiff must plausibly allege "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). "Context matters," because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." Id. at 69 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81-82 (1998)). "[A]lleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010).

In her Amended Complaint, the plaintiff alleges that once Catapano-Fox became the Executive Director of the CCRB, Catapano-Fox took a host of retaliatory actions against the plaintiff, including (1) telling other employees to stay away

from the plaintiff; (2) singling the plaintiff out for
discipline by writing the plaintiff a Supervisory Memorandum for
purportedly not following an ambiguous new policy; (3)
unjustifiably initiating an internal investigation against the
plaintiff; and (4) refusing to give the plaintiff a formal
evaluation for 2013, a year in which the plaintiff claims she
performed well.

At the pleading stage, these actions, in the aggregate,
"might have dissuaded a reasonable worker from making or
supporting a charge of discrimination." White, 548 U.S. at 68.
"[N]egative employment evaluation letters," such as the
Supervisory Memorandum, may be considered adverse actions.
Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002);
see also Hicks v. Baines, 593 F.3d at 170 (holding that it would
be an adverse action under § 1981 and the NYSHRL if an employee
were "disciplined (though innocent)" in retaliation for
participating in a discrimination investigation or proceeding).
The plaintiff's allegation that she was subjected to an
unwarranted investigation, if true, may add to the overall
context of retaliatory actions. See Treglia, 313 F.3d at 717
(noting that the plaintiff was subjected to internal
investigations, among other adverse actions); Lapaix v. City of
New York, No. 13cv7306, 2014 WL 3950905, at *6 (S.D.N.Y. Aug.
12, 2014) (holding that the plaintiff stated a retaliation claim

44

where he alleged "unwarranted investigations" as an adverse employment action).

The defendants argue that the plaintiff has not offered competent evidence in support of these allegations, but the Court may not resolve that issue on a motion to dismiss.  See Bolt Elec., Inc. v. City of N.Y., 53 F.3d 465, 469 (2d Cir. 1995).  Because the plaintiff added these allegations after the close of discovery, the defendants will be able to conduct additional discovery on the new allegations.  Summary judgment or trial is the appropriate stage to consider the facts behind the plaintiff's allegations of adverse actions, individually and in the aggregate.  Cf. Bernheim v. Litt, 79 F.3d 318, 326 (2d Cir. 1996) (stating, in First Amendment retaliation context, that "it would be burdensome to have the district court 'prune' a complaint at the pleading stage by making a determination with regard to each allegation within a cause of action that is legally cognizable when viewed in its totality").

### B.

The defendants dispute the causal connection between the adverse actions and the plaintiff's protected activity on the sole ground that the adverse actions are too far removed in time from the filing of this lawsuit.  The plaintiff filed this lawsuit in February 2013, and the alleged adverse actions occurred around August 2013.

45

At the prima facie stage, a plaintiff may satisfy the causation prong by resorting to temporal proximity.  Kwan, 737 F.3d at 845.  "Though [the Court of Appeals] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [the Court has] previously held that five months is not too long to find the causal relationship."  Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).  The defendants argue that the time lapse between February 2013 and August 2013, approximately six months, is too lengthy to satisfy the causation prong.  But prior to June 2013, Catapano-Fox did not have the "actual opportunity to retaliate" against the plaintiff because the plaintiff "was not directly working for" Catapano-Fox.  Summa v. Hofstra Univ., 708 F.3d 115, 128 (2d Cir. 2013).  Once Catapano-Fox assumed her position as Executive Director of the CCRB in June 2013, it was only approximately two months before she took the alleged retaliatory actions.  Accordingly, in the context of this case, the plaintiff has alleged "reasonably close temporal proximity" and a sufficient basis to infer causation.  Id. (holding that seven-month gap did not preclude a finding of causation where the plaintiff was not working for the alleged retaliators for much of that time).  The plaintiff also argues that Catapano-Fox treated her differently from comparable employees by

disciplining the plaintiff, and not others, for purportedly violating an ambiguous policy.  Hicks v. Baines, 593 F.3d at 170 (noting that "disparate treatment of fellow employees who engaged in similar conduct" may be circumstantial evidence of causation (quoting Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).  The defendants do not challenge this allegation in their motion.

Accordingly, the plaintiff has met her "*de minimis*" burden of demonstrating a prima facie case of retaliation.  Kwan, 737 F.3d at 844.  In their motion papers, the defendants do not articulate a legitimate, non-retaliatory motive for the alleged adverse actions.  Therefore, the defendants' motion to dismiss the plaintiff's retaliation claims for failure to state a claim is **denied.**

VI.

Finally, the defendant the City of New York moves to dismiss the § 1981 claims against it, arguing that the plaintiff has failed to allege sufficiently that the alleged violations were a result of a "policy or custom" such that liability could be imputed to the City of New York.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  A municipality can be liable for violating § 1981 only if the injury at issue resulted from the execution of a racially discriminatory "policy or custom." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989)

47

(holding that because the "express 'action at law' provided by
§ 1983 . . . provides the exclusive federal damages remedy for
[a] violation of the rights guaranteed by § 1981," plaintiff
"must show that the violation of his 'right to make contracts'
protected by § 1981 was caused by a custom or policy within the
meaning of Monell and subsequent cases"); see also Chin v. New
York City Hous. Auth., 575 F. Supp. 2d 554, 561 (S.D.N.Y. 2008).
"[I]f the challenged action is directed by an official with
'final policymaking authority,' the municipality may be liable
even in the absence of a broader policy." Mandell v. Cnty. of
Suffolk, 316 F.3d 368, 385 (2d Cir. 2003) (quoting Pembaur v.
City of Cincinnati, 475 U.S. 469, 481-83 (1986)).  Whether the
official in question possessed final policymaking authority is a
question of state law.  See Jeffes v. Barnes, 208 F.3d 49, 57
(2d Cir. 2000).

     The plaintiff alleges that Catapano-Fox took several
adverse employment actions against the plaintiff, including acts
of formal discipline, and that Catapano-Fox is the Executive
Director of the CCRB.  Am. Compl. ¶¶ 58-74.  The defendants
argue that the plaintiff has not specified the policymaking
authority of Catapano-Fox with sufficient particularity, but at
the motion to dismiss stage, "Monell claims are subject to the
same liberal pleading standards of Rule 8(a)(2)."  Cantey v.
City of New York, No. 10cv4043, 2012 WL 6771342, at *4 (S.D.N.Y.

48

Dec. 11, 2012).  The plaintiff alleges that Catapano-Fox, as
Executive Director, ordered retaliatory employment actions
against the plaintiff and that those actions were taken without
the need for intervention from any higher authority.  At the
pleading stage, these allegations are sufficient to show that
Catapano-Fox possessed final policymaking authority with regard
to CCRB personnel decisions.  See, e.g., Mandell, 316 F.3d at
385 (holding that police commissioner's alleged placement of
negative evaluation in officer's personnel file could constitute
retaliation, and that commissioner's "authority to set
department-wide personnel policies" was a basis for Monell
liability for the county); Rookard v. Health & Hospitals Corp.,
710 F.2d 41, 45 (2d Cir. 1983) (holding that Executive Director
of Harlem Hospital had authority to make policy based on his
position and ability to make final personnel decisions).

   In their motion papers, the defendants only direct their
arguments towards Edidin's purported lack of authority, and
devote no arguments concerning the policy-making role of
Catapano-Fox.[5]  Nevertheless, the defendants contend that those
arguments apply equally to Catapano-Fox.  They contend that the
New York City Charter vests policymaking authority for personnel

---

[5] At oral argument, the defendants suggested that they did not foresee the
plaintiff's arguments suggesting that Catapano-Fox was a final policymaker,
but Catapano-Fox figured prominently in the Amended Complaint.  Moreover, the
defendants submitted a reply brief after the plaintiff laid out her
arguments, and there are no Monell arguments in the reply brief.

matters to the Commissioner of the Department of Citywide
Administrative Services ("DCAS"), see N.Y. City Charter §§ 811,
814(c), and thus only the DCAS Commissioner can be the final
policymaker for personnel matters.  However, the Court of
Appeals has found that other New York City officials may be a
final policymaker.  See, e.g., Rookard, 710 F.2d at 45 (holding
that top officials in the Health and Hospitals Corporation were
final policymakers).  Moreover, the defendants have provided no
information regarding the CCRB Executive Director's
responsibilities under state law in order to explain why she is
not a final policymaker.  See Barry v. New York City Police
Dep't, No. 01cv10627, 2004 WL 758299, at *15 (S.D.N.Y. Apr. 7,
2004) (denying summary judgment for the defendants where the
defendants did not provide the court with enough information to
determine who had policymaking authority).  At the motion to
dismiss stage, the plaintiff's allegations that Catapano-Fox
took retaliatory actions against the plaintiff in Catapano-Fox's
position as Executive Director is sufficient to state a § 1981
claim against the City based on Catapano-Fox's actions.  See
Mandell, 316 F.3d at 385.

Accordingly, the City of New York's motion to dismiss the
plaintiff's § 1981 claims is **denied.**

## Conclusion

To the extent not specifically addressed above, any remaining arguments are either moot or without merit.  For the reasons explained above, the defendants' motion for summary judgment dismissing the plaintiff's hostile work environment and discrimination claims is **granted.**  All claims against defendant Edidin are **dismissed.** The defendants' motion for judgment on the pleadings dismissing the plaintiff's retaliation claims is **denied.  The Clerk is directed to close Docket No. 51.**


**SO ORDERED.**

**Dated:     New York, New York**
**           July 28, 2015           _____/s/_____**
**                                      John G. Koeltl**
**                                  United States District Judge**